**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| **AGB CONTEMPORARY A.G.,** | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | **NO. 20-1689** |
| | : | |
| **ARTEMUNDI LLC.** | : | |

## <u>MEMORANDUM</u>

**KEARNEY, J.** <span style="float:right">**May 13, 2021**</span>

A Swiss art dealer approached a Delaware entity to fund the purchase of a Pablo Picasso oil canvas painting last May. The principals exchanged emails detailing material terms in July 2020 confirming the Delaware entity agreed to fund the Swiss art dealer's purchase for resale. The Swiss art dealer reviewed the Picasso in Geneva before confirming terms by email and voice mail. The Delaware funding entity then reversed course and refused to fund the purchase depriving the Swiss art dealer an alleged $500,000 profit on resale. The Swiss dealer now sues the Delaware funding entity for breach of contract plausibly alleging emails and voicemails confirm the parties' agreement under the United Nations Convention on Contracts for the International Sale of Goods. The parties also entered into an enforceable escrow agreement requiring all disputes arising in connection with their escrow agreement would be exclusively submitted to the Courts of the canton of Geneva, Switzerland. The Swiss art dealer does not dispute the enforceability of this forum selection clause but argues its contract claim does not involve the escrow agreement. But the counseled parties agreed to a broad forum selection clause agreeing any dispute or claim arising in connection with the escrow agreement must be exclusively submitted to the art dealer's home court in Switzerland. While we find the Swiss art dealer plausibly pleads a breach of contract, we must dismiss its contract claim under the *forum non conveniens* doctrine without prejudice to submit its claim to the Courts in its home country, Switzerland.

## I.  Alleged facts

Switzerland-based AGB Contemporary A.G. began discussions last May with Artemundi LLC, a Delaware company which funds purchases of fine art for the purchase of *Fillette au beret*, a 1964 oil canvas painting by Pablo Picasso.[1] AGB Director Alain Benatar and Artemundi Chief Executive Officer Javier Lumbreras exchanged emails and spoke over the phone regarding the potential sale.[2]

AGB initially considered acting as an agent for a potential buyer but then decided to purchase the painting in its own name and resell it.[3] Artemundi proposed a form of an option agreement by which AGB would acquire an option to purchase the painting for $3,550,000.[4] AGB preferred to purchase the painting directly rather than sign an option agreement.[5]

The parties' negotiations reached terms in June 2020. AGB Director Benatar emailed Artemundi CEO Lumbreras on June 22, 2020 representing, "[w]e now have a firm offer at $3,500,000 USD net to you, subject to viewing in Geneva. My client made a huge effort on the price therefore please confirm me ASAP that we have a deal."[6] Around a week later, AGB Director Benatar followed up with an email to Artemundi CEO Lumbreras and his associate Giovana Edid explaining: "I will transfer you $10,000 for shipping expenses. If my client buys the work, this will be deducted from the $3,5M to pay you. Also please send me the shipping amount details. A conservator will come to do the condition report, out of the frame, of the painting."[7] Artemundi shipped the painting from New York to Geneva for AGB's viewing around the same time.[8]

After a satisfactory viewing, AGB Director Benatar and Artemundi CEO Lumbreras spoke on the phone regarding the price of the painting.[9] Artemundi CEO Lumbreras agreed to accept AGB Director Benatar's revised offer of $3,300,000.[10] They exchanged the following emails on July 6, 2020:

| Date/Time | Sender | Recipient | Message |
|---|---|---|---|
| 7/6/20 14:49 | AGB's Benatar | Mr. Edid (Mr. Lumbreras copied) | Dear Giovana, The viewing went well on Wednesday. But in the meantime my client bought a beautiful Picasso at Sotheby's auction this week for a good price. He's now considering strongly your painting and I am doing my best for this to happen at the agreed price, I'm confident. I am getting the condition report this weekend and so we should have a final answer on Monday or Tuesday at the latest. I will keep you posted. Best regards, Alain |
| 7/6/20 15:22 | Mr. Benatar | Mr. Lumbreras (Mr. Edid copied) | Dear Javier, I have an answer on the Picasso, please give me a call when you can. Regards, Alain |
| 7/6/20 18:11 | Mr. Benatar | Mr. Lumbreras (Mr. Edid and Attorney Sylvie Horowitz-Challande copied) | Dear Javier, I confirm our deal for your Picasso at $3,300,000 USD net to you. As discussed, the attorney Mrs. Sylvie Horowitz, copied on this email, will contact you tomorrow with a pro-format [sic] invoice proposition; it should be very simple so hopefully we will be able to finalise this very quickly. Kind regards, Alain |
| 7/6/20 19:50 | Mr. Lumbreras | Mr. Benatar (Mr. Edid and Attorney Horowitz-Challande copied) | Thank you Alain, I look forward to receiving Ms. Horowitz-Challande's correspondence. Yours, [Mr. Lumbreras][11] |

Four days later, Artemundi CEO Lumbreras left AGB Director Benatar a voicemail confirming the agreement.[12]

On July 8, 2020, Artemundi's Edid requested AGB provide written confirmation (1) the purchase money came from legal sources and (2) neither the buyer nor the beneficial owner of the escrow account were on any sanctions list.[13] Mr. Edid's request did not suggest conditioning performance upon AGB's compliance with the request.[14] Later the same day, AGB Director

Benatar confirmed this information with Artemundi.[15] Mr. Edid confirmed the sufficiency of AGB Director Benatar's letter through an email.[16]

"[W]ithin days after the July 6, 2020 emails," AGB and Artemundi agreed on the language of a pro forma invoice and written escrow agreement to outline the details for payment and transfer of possession.[17] Their attorneys assisted in finalizing the language in both documents.[18] The escrow agreement included a mandatory forum selection clause requiring "[a]ny dispute, controversy or claim arising out of or in connection with this Agreement" to be "exclusively submitted…to the Courts of the canton of Geneva, Switzerland."[19] The escrow agreement further included a choice of law provision stating, "[t]his Agreement shall be exclusively governed by and construed in accordance with the substantive laws of Switzerland."[20] "Agreement" is defined as "the present escrow agreement with the Escrow Agent."[21]

According to the escrow agreement—made "to secure the foreseen sale and purchase transaction"—AGB would transfer the net purchase price of $3,300,000 to the escrow agent.[22] In exchange, Artemundi would send the escrow agent (1) a letter from Henri Harsch HH SA (the company storing the painting) confirming it holds the original certificate of authenticity for the painting and that it would release the certificate to AGB together with the painting and (2) a letter of transfer of ownership of the painting signed by Artemundi's representatives.[23] Upon receipt of the final invoice for the painting, the escrow agreement required the escrow agent to transfer the funds to Artemundi's account and send the letter of transfer of ownership to Henri Harsch.[24] The parties' attorneys attached the draft pro-forma invoice reflecting the sale terms to the escrow agreement.[25]

Artemundi transmitted a certificate of authenticity for the painting to Henri Harsch, which confirmed receipt of the certificate.[26] Artemundi also sent the escrow agent a digital signed copy

of the transfer of ownership letter.[27] Artemundi CEO Lumbreras signed the escrow agreement on behalf of Artemundi but neither AGB nor the purported escrow agent, Attorney Horowitz-Challande, signed it.[28]

After Artemundi CEO Lumbreras signed the agreement, AGB's counsel pointed out it did not incorporate some of the terms to which the parties had agreed, for example, confirming a digital copy of the transfer of ownership letter would suffice.[29] At Artemundi's request, AGB's counsel provided an updated escrow agreement incorporating these changes.[30] The forum selection clause and choice of law provision remained unaltered from the original escrow agreement.[31] On the day he received the updated escrow agreement, Artemundi CEO Lumbreras promised AGB's counsel he would send a signed copy as soon as he could "reach an iPad."[32] Artemundi CEO Lumbreras left AGB Director Benatar a voicemail later the same day saying "thank you for the transaction."[33]

AGB obtained a contract to resell the painting to a third party buyer for a profit of $500,000.[34] On July 15, 2020, Artemundi's counsel emailed AGB's Swiss counsel purporting to terminate the sale and requesting wire transfer instructions for Artemundi to repay the shipping expenses AGB paid in advance.[35]

On December 11, 2020, AGB sued Artemundi for breach of contract and anticipatory breach of contract under the United Nations Convention on Contracts for the International Sale of Goods ("CISG").[36] AGB alleges it incurred lost profits and reputational loss due to Artemundi's breach and seeks damages of at least $500,000.[37]

## II.    Analysis

Artemundi moves to dismiss arguing AGB fails to plausibly allege the existence of a contract.[38] Artemundi alternatively argues we should dismiss under the *forum non conveniens*

doctrine because the parties' purportedly binding escrow agreement included a mandatory forum selection clause requiring all suits be brought in Switzerland.[39]

AGB argues it plausibly alleges the formation of a binding contract—through offer and acceptance—under the CISG.[40]It further argues the forum selection clause in the escrow agreement does not apply because AGB alleges a breach of the sale agreement rather than of the escrow agreement.[41]

After careful review, we conclude AGB plausibly alleges offer and acceptance and the existence of a contract for the sale of the painting under the CISG. We also conclude dismissal is required under the *forum non conveniens* doctrine because the forum selection clause is valid, enforceable, and applies to AGB's breach of contract claim.

### A. The CISG applies to AGB's contract claim.

AGB contends its breach of contract claim is governed by the CISG.[42] Artemundi "does not concede" the CISG applies to the claim but nonetheless applies case law interpreting the CISG.[43] We agree the CISG governs AGB's claim.

The CISG "'applies to contracts of sale of goods between parties whose places of business are in different States…when the States are Contracting States[.]'"[44] AGB's claim involves the sale of a painting, a physical good.[45] AGB is based in Switzerland while Artemundi is based in the United States.[46] Both Switzerland and the United States are Contracting States.[47] No exceptions to the CISG's applicability are relevant here.[48] The CISG applies to the breach of contract claim.[49]

### B. AGB plausibly alleges it formed a contract with Artemundi for defined terms.

Artemundi argues AGB's breach of contract claim fails because AGB fails to plausibly allege a contract—offer and acceptance—for the sale of the painting.[50] Artemundi argues AGB Director Benatar's July 6 email does not constitute an offer under the CISG because it lacked

sufficiently definite terms and failed to express AGB's intent to be bound by terms.[51] Artemundi further argues, even if AGB made an offer, it did not accept such offer merely by responding "thank you" to the offer.[52] Artemundi finally argues the parties' negotiations after July 6 did not cure alleged deficiencies in the July 6 contract formation.[53]

AGB responds it plausibly alleges the requisite elements of a contract under the CISG.[54] AGB argues it made a sufficiently definite offer to buy the painting for $3,300,000 and Artemundi CEO Lumbreras and AGB Director Benatar subsequently spoke on the phone and over email to "confirm" this offer.[55] AGB further argues it plausibly alleges Artemundi's acceptance of its offer through verbal conversations, Artemundi CEO Lumbreras's July 6 email thanking AGB Director Benatar for confirming the "deal," and Artemundi CEO Lumbreras's July 10 voicemail confirming the transaction.[56] AGB finally argues the parties' post-July 6 negotiations did not alter or invalidate the original sale agreement.[57]

Under the CISG, "[a] contract is concluded at the moment when an acceptance of an offer becomes effective in accordance with the provisions of this Convention."[58] The CISG further provides a contract "need not be concluded in or evidenced by writing and is not subject to any other requirement as to form."[59] A contract under the CISG may instead "be proved by any means, including witnesses."[60] We must determine whether AGB has plausibly alleged both offer and acceptance as defined by the CISG.

### 1. AGB plausibly alleges an offer to Artemundi to purchase the Picasso.

Artemundi argues AGB's July 6 email lacked sufficient details to constitute an offer under the CISG. AGB argues its email contained all the requisite elements of an offer—the product, quantity, and price. We agree with AGB.

The CISG defines an "offer" as a proposal which is "sufficiently definite and indicates an intention of the offeror to be bound in the case of acceptance."[61] A proposal is "sufficiently definite" so long as it "indicates the goods and expressly or implicitly fixes or makes provision for determining the quantity and the price."[62] Article 8 of the CISG further outlines the determination of a party's intent:

(1) For the purposes of this Convention statements made by and other conduct of a party are to be interpreted according to his intent where the other party knew or could not have been unaware what that intent was.

(2) If the preceding paragraph is not applicable, statements made by and other conduct of a party are to be interpreted according to the understanding that a reasonable person of the same kind as the other party would have had in the same circumstances.

(3) In determining the intent of a party or the understanding of a reasonable person would have had, due consideration is to be given to all relevant circumstances of the case including the negotiations, any practices which the parties have established between themselves, usages and any subsequent conduct of the parties.[63]

AGB alleges its Director Benatar began discussing the purchase of the painting in May 2020. In late June 2020, AGB Director Benatar emailed Artemundi CEO Lumbreras explaining "[w]e now have a firm offer at $3,500,000 USD net to you, subject to viewing in Geneva…" AGB Director Benatar also emailed Artemundi CEO Lumbreras to confirm AGB would send $10,000 to cover shipping expenses for the viewing. Artemundi subsequently shipped the painting to Geneva. This shipping, as alleged, plausibly confirms Artemundi intended to proceed.

On July 6—after the viewing—AGB Director Benatar and Artemundi CEO Lumbreras conversed over email and the phone regarding the purchase price. AGB alleges Artemundi CEO Lumbreras agreed to AGB's revised purchase price of $3,300,000. AGB Director Benatar then emailed Artemundi CEO Lumbreras confirming the deal:

Dear Javier,
I confirm our deal for your Picasso at $3,300,000 USD net to you.
As discussed, the attorney Mrs. Sylvie Horowitz, copied on this email, will contact
you tomorrow with a pro-format [sic] invoice proposition; it should be very simple
so hopefully we will be able to finalise this very quickly.
Kind regards, Alain

Artemundi CEO Lumbreras responded shortly thereafter, thanking AGB Director Benatar and stating he looked forward to hearing from Attorney Horowitz-Challande. A few days later, on July 10, Artemundi CEO Lumbreras allegedly left AGB Director Benatar a voicemail further confirming the agreement.

AGB contends its Director Benatar's July 6 email "confirm[ing] [AGB and Artemundi's] deal for [Artemundi's] Picasso at $3,300,000" constituted a sufficiently definite proposal to be considered an offer. We agree. Under the CISG, a proposal is sufficiently definite if it "indicates the goods" and either explicitly or implicitly makes provision to determine the quantity and price of the goods. Consistent with this standard, Judge Hellerstein in *Hanwha Corporation v. Cedar Petrochemicals, Inc.* found it "clear" a bid constituted an offer under the CISG where it was made "for a specific product, at a specific price, and for a specific quantity."[64] AGB Director Benatar's July 6 email similarly contains these essential elements. It is sufficiently definite to constitute an offer under the CISG.

The cases cited by Artemundi do not compel a different conclusion. In *Syral Belgium N.V. v. U.S. Ingredients, Inc.*, for example, Chief Judge Stark concluded a proposal to compensate a party for expenses incurred for "oversupply" shipments did not offer sufficiently definite terms to constitute an offer.[65] Chief Judge Stark explained the proposal did not explain what qualified as an "oversupply" shipment and provided the purported offeror no way of calculating how much it allegedly owed in reimbursement costs. AGB Director Benatar's email, unlike the deficient proposal in *Syral*, specifies the good, the quantity, and the price.[66]

AGB further plausibly alleges an intent to be bound in the event of acceptance. AGB Director Benatar allegedly emailed Artemundi CEO Lumbreras and informed him he had an answer regarding the purchase of the painting. After AGB Director Benatar and Artemundi CEO Lumbreras presumably spoke on the phone, AGB Director Benatar again emailed Artemundi CEO Lumbreras to "confirm [their] deal" for $3,300,000 and stated AGB's attorney would reach out to Artemundi CEO Lumbreras to finalize the deal. AGB's communications, especially when interpreted in the light most favorable to AGB and in the context of their earlier negotiations and conversations, demonstrates an intent to be bound.

### 2. AGB plausibly alleges Artemundi accepted its July 6 offer.

Artemundi next argues AGB fails to allege Artemundi CEO Lumbreras accepted AGB's July 6 offer because AGB does not demonstrate, for example, CEO Lumbreras (1) said "I accept"; (2) told AGB's agents to proceed with a wire transfer; or (3) assured AGB Director Benatar the painting would belong to AGB once Artemundi received the purchase price.[67] AGB argues "there is no magic formula for assent" and we may draw a plausible inference Artemundi accepted AGB's offer based on phone conversations, Artemundi CEO Lumbreras's July 6 email thanking AGB Director Benatar for confirming the "deal," and Artemundi CEO Lumbreras's July 10 voicemail confirming the transaction.[68] We agree with AGB.

The CISG defines acceptance as "[a] statement made by or other conduct of the offeree indicating assent to an offer."[69] Silence or inactivity alone do not constitute acceptance.[70] The CISG further provides "[a] reply to an offer which purports to be an acceptance but contains additions, limitations or other modifications is a rejection of the offer and constitutes a counter-offer."[71]

Courts interpreting the CISG have found acceptance through various means, including by phone conversations, emails confirming terms of a sale, or other conduct indicating agreement with the offer terms. In *VLM Food Trading International, Inc. v. Illinois Trading Co.*, for example, the Court of Appeals for the Seventh Circuit found an email confirmation in response to a purchase order outlining the item, quantity, price, and place of delivery of the goods constituted acceptance to the purchase order.[72] The court of appeals noted, even assuming no email confirmations existed, it would have found acceptance of the offer through the seller's delivery of the goods.[73] Judge Schwab in *Roser Technologies, Inc. v. Carl Schreiber GmbH* similarly concluded a party accepted an offer under the CISG through an email stating it had reviewed the order confirmation and informing the other party it could "proceed with the manufacture of [the goods]."[74]

AGB alleges, after the viewing in Switzerland, Artemundi CEO Lumbreras and AGB Director Benatar spoke on the phone regarding the purchase price for the painting and Artemundi CEO Lumbreras agreed to AGB's revised offer to pay $3,300,000 for the painting. AGB Director Benatar then emailed Artemundi CEO Lumbreras to "confirm [their] deal" and to inform him AGB's counsel would follow up with an invoice. Artemundi CEO Lumbreras then thanked AGB Director Benatar and said he looked forward to the correspondence. Four days later, Artemundi CEO Lumbreras left AGB Director Benatar a voicemail, again thanking him for the transaction. When considered together, and interpreted in the light most favorable to AGB, we find Artemundi CEO Lumbreras's communications—over the phone and email—indicated Artemundi's assent to AGB's offer to purchase the painting for $3,300,000.

Artemundi argues its subsequent conduct with respect to the draft escrow agreement disproves the existence of a sale agreement.[75] It specifically argues the lack of an agreement is evidenced by the parties continuing to negotiate escrow agreement terms such as the terms of

delivery.[76] AGB argues any conduct related to the escrow agreement—a separate agreement used to simply facilitate the execution of the sale agreement—does not disprove the existence of the original sale agreement.[77] We agree with AGB.

The only question properly before us is whether AGB plausibly alleges a contract—offer and acceptance—for the sale of the painting such that Artemundi could have breached the contract. We conclude AGB alleges a contract irrespective of the subsequent escrow agreement.

### C. The forum selection clause in the escrow agreement warrants dismissal.

Artemundi also argues, even assuming we conclude a contract existed, we must dismiss because the escrow agreement contains a forum selection clause requiring all claims be submitted to Swiss courts.[78] AGB argues the forum selection clause does not apply to its contract claim because it is expressly limited to disputes "arising out of or in connection with this Agreement," and the parties defined the "Agreement" as the "the present escrow agreement with the Escrow Agent."[79] We agree with Artemundi.

The Supreme Court instructs "the appropriate way to enforce a forum-selection clause pointing to a state or foreign forum is through the doctrine of *forum non conveniens*."[80] Before conducting the *forum non conveniens* analysis, however, we must decide whether the forum selection clause (1) is enforceable; and (2) applies to the claim at issue.

The parties do not dispute, at least for purposes of this argument, the forum selection clause in the escrow agreement is enforceable. Forum selection clauses are "typically 'prima facie valid and should be enforced' unless a plaintiff can demonstrate that 'enforcement would be unreasonable and unjust, or that the clause was invalid for such reasons as fraud or overreaching.'"[81] AGB does not contend enforcement of the forum selection clause would be unreasonable or resulted from fraud. It concedes the escrow agreement and underlying sale

agreement are valid and enforceable.[82] We agree the forum selection clause is valid and enforceable.

AGB instead focuses its argument on the scope of the forum selection clause, arguing the clause does not apply because it "does not allege a breach of the escrow agreement."[83] AGB concedes the escrow agreement is "related" to the underlying sale agreement but argues they are still separate contracts.[84] We disagree. Even assuming the contracts are separate, the broad scope of the forum selection clause covers AGB's breach of contract claim.

The parties agreed the escrow agreement should be construed in accordance with the "substantive laws of Switzerland."[85] The parties do not, however, refer to Swiss law. We assume they do not rely on unique features of Swiss law and we instead base our decision on general contract law principles.[86] "We interpret a forum selection clause in accordance with its plain meaning" and give effect to language that unambiguously states the parties' intentions.[87]

The forum selection clause provides: "Any dispute, controversy, or claim arising out of *or in connection with* this Agreement…shall be exclusively submitted to" the courts of Switzerland.[88] In *Wyeth*, our Court of Appeals explained the phrase "any dispute arising…in relation to" an agreement broadly means "the origin of the dispute is related to that agreement, *i.e.*, that the origin of the dispute has some 'logical or causal connection' to the [agreement]."[89] The court in *Wyeth* further explained "arising in relation to" is broader than "arising under," expressly rejecting the contention the language only covers disputes arising out of the subject agreement.[90] Consistent with this reasoning, district courts in this Circuit have found analogous contractual language to apply "very broad[ly]."[91]

 In *TrustID*, for example, Chief Judge Stark dismissed trade secret misappropriation and interference claims, concluding they fell within the scope of a broad forum selection clause

mandating "[a]ny dispute that may arise in connection with the interpretation or implementation of this Agreement" be filed in Colorado.[92] Chief Judge Stark explained the trade secret misappropriation claim fit within its scope because the court would have to interpret the agreement containing the forum selection clause to understand how the trade secret misappropriation claims may have arisen.[93] He likewise found the interference claim fell within the clause's broad scope because the parties' contractual relationship—through the agreement—required plaintiff provide defendant with certain pricing information and marketing plans, which the defendant allegedly used to interfere with plaintiff's contractual relationships.[94] The interference claims therefore arose "in connection" with the implementation of the agreement.[95]

AGB's breach of contract claim, as alleged, similarly "aris[es]…in connection with" the escrow agreement. Even assuming there exist separate agreements for the sale of the painting and for the use of an escrow agent to complete the transfer, the origin of AGB's breach of contract claim has a logical or causal connection to the escrow agreement. AGB's allegations admit the required connection. AGB alleges, for example: (1) the parties agreed on the terms of the pro forma invoice and escrow agreement "in further performance of the [sale agreement]" and (2) "Artemundi breached the [sale agreement] by purporting to cancel the agreement before AGB's escrow agent could receive and release funds."[96] The terms of the escrow agreement further establish the requisite connection with the claim. The language of the escrow agreement makes clear the parties agreed to enter into the escrow agreement to "to secure the foreseen sale and purchase transaction."

The authority cited by AGB in its response is distinguishable. The forum selection clause at issue in *New Gold Equities Crop. v. Capital Growth Real Estate, Inc.*, for example, only applied to "any dispute arising hereunder."[97] Judge Sand found the language of this clause limited to claims

arising under the subject agreement and did not extend to claims solely regarding an earlier, separate agreement entered into for different purposes and which created different obligations.[98] By contrast, the language of the forum selection clause before us applies not only to disputes arising under the escrow agreement, but also extends to any disputes arising in connection with the escrow agreement. As our Court of Appeals explained in *Wyeth*, the language at issue here is broader and extends to disputes having a logical or causal connection to the escrow agreement. AGB's allegations, including the terms of the escrow agreement, confirm its breach of contract claim falls within the scope of the broad forum selection clause.

Having concluded the forum selection clause is enforceable and AGB's breach of contract claim falls within its scope, we now turn to the *forum non conveniens* analysis. Our Court of Appeals instructs our analysis should generally include consideration of four factors: "(1) the amount of deference to be afforded to plaintiffs' choice of forum; (2) the availability of an adequate alternative forum where defendants are amenable to process and plaintiffs' claims are cognizable; (3) relevant 'private interest' factors affecting the convenience of the litigants; and (4) relevant 'public interest' factors affecting the convenience of the forum."[99] The Supreme Court instructs we should alter these factors in various ways if there exists a forum selection clause.[100] Specifically, the plaintiff's choice of forum and the private interest factors are not afforded any weight.[101] We accordingly only consider the second and fourth factors, which the Supreme Court instructs will overcome a forum selection clause in only the most "unusual" and "extraordinary" circumstances.[102] The party resisting application of a forum selection clause "bears a heavy burden."[103]

AGB does not dispute the availability of another forum to hear its claim. It is based in Switzerland. Nor has it shown consideration of public interest factors—for example, Delaware's

local interest in having localized controversies decided at home—would "overwhelmingly disfavor a transfer."[104] Public interest factors weigh in favor of adjudication in the chosen Switzerland forum, especially considering (1) the escrow agreement provides for the application of the laws of Switzerland; and (2) a Switzerland-based company seeks to enforce a contract against a Delaware entity and the Delaware entity seeks to resolve the matter in Switzerland. AGB does not meet its burden in overcoming the application of the forum selection clause.

## III. Conclusion

We grant Artemundi's Motion to dismiss. While AGB plausibly alleges the formation of a contract for the sale of *Fillette au beret* which may lead to finding Artemundi may be liable for a breach, AGB and Artemundi agreed to litigate this dispute in Switzerland. Our analysis under the *forum non conveniens* doctrine requires we dismiss without prejudice to AGB pursuing its contract remedies in Switzerland.

---

[1] ECF Doc. No. 1 ¶¶ 11-14.

[2] *Id.* ¶ 3.

[3] *Id.* ¶¶ 14-15.

[4] *Id.* ¶ 15.

[5] *Id.*

[6] ECF Doc. No. 13-1 at 8.

[7] *Id.* at 10.

[8] ECF Doc. No. 1 ¶ 16.

[9] *Id.* ¶ 17.

[10] *Id.*

[11] ECF Doc. No. 13-1 at 12-18. We may consider these emails in evaluating AGB's Motion to dismiss as they are "'matters incorporated by reference or integral to the complaint.'" *See Johnson*

*v. Lutton*, 466 F. Supp. 3d 472, 474 (M.D. Pa. 2020) (quoting *Buck v. Hampton Twp. Sch. Dist.*, 452 F.3d 256, 260 (3d Cir. 2006)).

[12] ECF Doc. No. 1 ¶ 17.

[13] *Id.* ¶ 20.

[14] *Id.*

[15] *Id.*

[16] *Id.*

[17] *Id.* ¶ 22.

[18] *Id.*

[19] ECF Doc. No. 1-1 at 7.

[20] *Id.*

[21] *Id.* at 3.

[22] *Id.* at 3.

[23] *Id.* at 4.

[24] *Id.* at 4-5.

[25] ECF Doc. No. 1-2.

[26] ECF Doc. No. 1 ¶ 25.

[27] *Id.*

[28] ECF Doc. No. 1-1 at 8.

[29] ECF Doc. No. 1 ¶ 27.

[30] *Id.*

[31] ECF Doc. No. 1-2 at 7-8.

[32] *Id.*

[33] *Id.*

[34] *Id.* ¶ 29.

[35] *Id.* ¶ 30.

[36] *Id.* ¶¶ 32-37.

[37] *Id.* ¶¶ 31, 37.

[38] *See* ECF Doc. No. 13 at 12-17.
Federal Rule of Civil Procedure 12(b)(6) requires a complaint to state a claim upon which relief can be granted. Fed. R. Civ. P. (12)(b)(6). The purpose of Rule 12(b)(6) is to test the sufficiency of the factual allegations in a complaint. *Sanders v. United States*, 790 F. App'x 424, 426 (3d Cir. 2019). If a plaintiff is unable to plead "enough facts to state a claim to relief that is plausible on its face," the court should dismiss the complaint. *Id.* (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *see also Kajla v. U.S. Bank Nat'l Ass'n as Tr. for Credit Suisse First Bos. MBS ARMT 2005-8*, 806 F. App'x 101, 104, n.5 (3d Cir. 2020) (quoting *Warren Gen. Hosp. v. Amgen Inc.*, 643 F.3d 77, 84 (3d Cir. 2011)).

"A claim has facial plausibility when the plaintiff pleads factual content ... allow[ing] the court to draw the reasonable inference ... the defendant is liable for the misconduct alleged." *Robert W. Mauthe M.D., P.C. v. Spreemo, Inc.*, 806 F. App'x 151, 152 (3d Cir. 2020) (quoting *Zuber v. Boscov's*, 871 F.3d 255, 258 (3d Cir. 2017)). While "[t]he plausibility standard is not akin to a 'probability requirement,'" it does require the pleading show "more than a sheer possibility ... a defendant has acted unlawfully." *Riboldi v. Warren Cnty. Dep't of Human Servs. Div. of Temp. Assistance & Soc. Servs.*, 781 F. App'x 44, 46 (3d Cir. 2019) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "A pleading that merely 'tenders naked assertion[s] devoid of further factual enhancement' is insufficient." *Id.* (quoting *Iqbal*, 556 U.S. at 668).

In determining whether to grant a 12(b)(6) motion, "we accept all well-pleaded allegations as true and draw all reasonable inferences in favor of the plaintiff" but "disregard threadbare recitals of the elements of a cause of action, legal conclusions, and conclusory statements." *Mauthe*, 806 F. App'x at 152 (quoting *City of Cambridge Ret. Sys. v. Altisource Asset Mgmt. Corp.*, 908 F.3d 872, 878-79 (3d Cir. 2018)). Our Court of Appeals requires us to apply a three-step analysis under a 12(b)(6) motion: (1) "it must 'tak[e] note of the elements [the] plaintiff must plead to state a claim;'" (2) "it should identify allegations that, 'because they are no more than conclusions, are not entitled to the assumption of truth;'" and, (3) "[w]hen there are well-pleaded factual allegations, [the] court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief." *Connelly v. Lane Constr. Corp.*, 809 F.3d 780, 787 (3d Cir. 2016) (quoting *Iqbal*, 556 U.S. at 675, 679).

[39] ECF Doc. No. 13 at 17-18.

[40] ECF Doc. No. 17 at 14-20.

[41] *Id.* at 20-21.

[42] ECF Doc. No. 1 ¶ 8.

[43] ECF Doc. No. 13 at 12.

[44] *Forestal Guarani S.A. v. Daros Intern., Inc.*, 613 F.3d 395, 397 (3d Cir. 2010) (quoting United Nations Convention on Contracts for the International Sale of Goods, Apr. 11, 1980, S. TREATY DOC. NO. 98-9, 1489 U.N.T.S. 3 (1983) (hereinafter "CISG"), Art. 1(1)(a)).

[45] ECF Doc. No. 1 ¶ 1.

[46] *Id.* ¶¶ 11-12.

[47] *See Status: United Nations Convention on Contracts for the International Sale of Goods (Vienna, 1980) (CISG)*, United Nations, https://uncitral.un.org/en/texts/salegoods/conventions/sale_of_goods/cisg/status (last visited May 5, 2021).

[48] CISG, Art. 2.

[49] *Forestal Guarani S.A.*, 613 F.3d at 397 ("Because both the United States, where [buyer] is based, and Argentina, where [seller] is based, are signatories to the CISG and the alleged contract at issue involves the sale of goods, we agree with the parties that the CISG governs [seller's] claim.").

[50] ECF Doc. No. 13 at 12-15.

[51] *Id.* at 13-14.

[52] *Id.* at 14-15.

[53] *Id.* at 15-17.

[54] ECF Doc. No. 17 at 14-20.

[55] *Id.* at 16-17.

[56] *Id.* at 17-18.

[57] *Id.* at 18-20.

[58] CISG, Art. 23.

[59] CISG, Art. 11.

[60] *Id.*

[61] CISG, Art. 14(1).

[62] *Id.*

[63] CISG, Art. 8.

[64] 760 F. Supp. 2d 426, 432 (S.D.N.Y. 2011).

[65] No. 15-1172, 2016 WL 47281801, at *3-4 (D. Del. Sept. 9, 2016).

[66] Artemundi also cites to an inapposite case applying principles of Delaware contract law. *See* ECF Doc. No. 13-14 (citing *Frazier v. Am. Airlines, Inc.*, 434 F. Supp. 2d 279, 286-87 (D. Del. 2006), *aff'd*, 229 F. App'x 171 (3d Cir. 2007)).

[67] ECF Doc. No. 13 at 14-15.

[68] ECF Doc. No. 17 at 17-18.

[69] CISG, Art. 18(1).

[70] *Id.*

[71] CISG, Art. 19(1).

[72] 811 F.3d 247, 250 (7th Cir. 2016).

[73] *Id.* at 252, n.2.

[74] No. 11-302, 2013 WL 4852314, at *11 (W.D. Pa. Sept. 10, 2013).

[75] ECF Doc. No. 13 at 15-17.

[76] *Id.* at 16-17.

[77] ECF Doc. No. 17 at 18-20.

[78] ECF Doc. No. 13 at 17-18.

[79] ECF Doc. No. 17 at 20-21.

[80] *Atlantic Marine Const. Co., Inc. v. U.S. Dist. Court for Western Dist. of Texas*, 571 U.S. 49, 60 (2013).

[81] *Podesta v. Hanzel*, 684 F. App'x 213, 216 (3d Cir. 2017) (quoting *M/S Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 10, 15 (1972)).

[82] *See* ECF Doc. No. 1 ¶¶ 4, 24-27; ECF Doc. No. 17 at 18-20.

[83] ECF Doc. No. 17 at 21.

[84] *Id.*

[85] ECF Doc. No. 1-1 at 7; ECF Doc. No. 1-2 at 7.

[86] *See John Wyeth & Bro. Ltd. v. CIGNA Intern. Corp.*, 119 F.3d 1070, 1074 (3d Cir. 1997) ("[T]he forum selection clause in the Agreement states that the agreement is to be governed by 'English law.' The parties, however, make little reference to English contract law. In view of the parties' briefing, we will assume that they do not rely on any distinctive features of English law and we will therefore base our decision on general contract law principles.").

[87] *In re McGraw-Hill Global Education Holdings LLC*, 909 F.3d 48, 67 (3d Cir. 2018); *Otto v. Erie Ins. Exchange*, 11 F. Supp. 3d 482, 483 (E.D. Pa. 2014).

[88] ECF Doc. No. 1-1 at 7; ECF Doc. No. 1-2 at 8 (emphasis added).

[89] 119 F.3d at 1074.

[90] *Id.* at 1074-75.

[91] *See, e.g., TrustID, Inc. v. Next Caller, Inc.*, No. 18-172, 2019 WL 1324948, at *2 (D. Del. Mar. 25, 2019) (citations and quotations omitted); *see also In re DaimlerChrysler AG Securities Litigation*, No.00-993, 2003 WL 22769051, at *2 (D. Del. Nov. 19, 2003) (finding a waiver to a right to a jury trial to be "broadly worded" where it applied to any claim or action "arising out of or in connection with" an agreement or the transactions contemplated thereby).

[92] 2019 WL 1324948 at *1-2.

[93] *Id.* at *2 ("The trade secret misappropriation claims 'arise in connection with the interpretation' of the Agreement because 'the Court must interpret the Agreement in order to understand how the trade secret misappropriation claims have arisen.'") (citations omitted).

[94] *Id.*

[95] *Id.*

[96] ECF Doc. No. ¶¶ 22, 35.

[97] No. 89-5472, 1990 WL 1272, at *1 (S.D.N.Y. Jan. 2, 1990).

[98] *Id.* at *2-3.

[99] *Collins on behalf of herself v. Mary Kay, Inc.*, 874 F.3d 176, 186 (3d Cir. 2017) (quoting *Kisano Trade & Invest Ltd. v. Lemster*, 737 F.3d 869, 873 (3d Cir. 2013)).

[100] *Atlantic Marine Const. Co., Inc. v. U.S. Dist. Court for W. Dist. of Texas*, 571 U.S. 49, 63 (2013).

[101] *Id.* at 63-65.

[102] *Id.* at 62, 64.

[103] *Collins*, 874 F.3d at 186-87 (citing *Atlantic Marine*, 571 U.S. at 582).

[104] *Atlantic Marine*, 571 U.S. at 67.